# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 18-882V
UNPUBLISHED

| | |
|---|---|
| MINDY LAWSON,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: January 5, 2021<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Leah V. Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.

*Zoe Wade*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On June 20, 2018, Mindy Lawson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") after receipt of an influenza ("flu") vaccine in her left deltoid on September 1, 2016. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$215,688.69, representing 205,000.00 for her actual pain**

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**and suffering, and $10,688.69 for her past out-of-pocket expenses.** Petitioner is not, however, entitled to compensation for expected *future* pain and suffering.

## I.    Relevant Procedural History

Approximately 11 months after this case was initiated, Respondent filed his Rule 4(c) Report on May 6, 2019, conceding that Petitioner was entitled to compensation. ECF No. 25. A ruling on entitlement was issued on that same day. ECF No. 36. The parties thereafter attempted to informally resolve damages but were unsuccessful. ECF No. 47. On August 27, 2020, I issued a scheduling order regarding the briefing of disputed damages issues. ECF No. 48. The parties filed their respective briefs (ECF Nos. 50 ("Br."), 54 ("Opp."), and 57 ("Resp.")). The parties requested to argue their positions at a motions hearing, at which time I would decide the disputed damages issues (which featured only a dispute as to pain and suffering, since they did not dispute unreimbursable past expenses). ECF. Nos. 47, 56. That hearing was held on December 11, 2020, and this decision memorializes my oral ruling provided on that date.[3]

## II.    Relevant Medical History

A complete recitation of the facts can be found in the Petition, the parties' respective pre-hearing briefs, and in Respondent's Rule 4(c) Report. At the time of vaccination, Ms. Lawson was a 35-year-old nurse with a non-contributory medical history. Ex. 3 at 15. She received the flu vaccine in her left arm on September 1, 2016, at her job. Ex. 1 at 25, Ex. 6 at 2.

On September 7, 2016, Ms. Lawson presented to Prime Care Courtland for a workers' compensation evaluation. Ex. 6 at 1. Petitioner indicated to the nurse practitioner that she had received the flu vaccine "too high on her left shoulder" and had been in significant pain ever since. *Id.* at 2. Petitioner described the pain as "moderate in severity, constant, sharp, and acing." *Id.* Petitioner's muscular strength was documented at 3/5 in her left deltoid with limited active range of motion with abduction. *Id.* at 3. Petitioner was diagnosed with shoulder pain and was prescribed Naproxen, cyclobenzaprine, and RICE therapy. *Id.*

On September 11, 2016, Petitioner returned to Prime Care Courtland for worsening left shoulder pain since her last visit. Ex. 6 at 6. Petitioner was diagnosed with vaccine complications, was prescribed medication, and an MRI was ordered. *Id.* at 7. Over the next month, Petitioner returned for additional medical visits for her shoulder pain,

---

[3] At the end of the hearing held on December 11, 2020, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

2

including a visit to orthopedist, Dr. Ali Hashemi, who diagnosed Petitioner with rotator cuff tendinitis and shoulder bursitis, and prescribed her a Medrol Dosepak. Ex. 1 at 26.

Ms. Lawson had her first physical therapy (PT) evaluation on October 7, 2016. Ex. 1 at 95. Petitioner attended five PT sessions in the two weeks that followed. *Id.* at 73-76. On December 14, 2016, Petitioner returned to Dr. Hashemi with continued shoulder pain, where she received her first cortisone injection. *Id.* at 20.

Petitioner had her first MRI on April 20, 2017. Ex. 4 at 14. The MRI revealed "1. Mild supraspinatus and infraspinatus tendinopathy. No focal rotator cuff tear. 2. Possible small intrasubstance tear in the infraspinatus tendon. 3. Mild acromioclavicular degenerative changes. 4. Mild fluid in the subacromial/subdeltoid bursa, possibly bursitis." *Id.* On April 22, 2017, Dr. Hashemi diagnosed Petitioner with left shoulder impingement syndrome and rotator cuff tendonitis. Ex. 1 at 17. Instead of surgery, Petitioner elected to receive a second cortisone injection and continue PT. *Id.* Petitioner had her second PT evaluation on May 4, 2017. *Id.* at 91. Petitioner attended seven PT sessions in the three weeks that followed. Ex. 1 at 60-66, 83.

Ms. Lawson had her first shoulder surgery, including left shoulder diagnostic arthroscopy, subacromial decompression, extensive debridement, and extensive bursectomy, on July 18, 2017. Ex. 1 at 433. The findings of the surgery were "an extensive bursitis around the rotator cuff, which was debrided and also partial tear at the bursal surface of the rotator cuff near the supraspinatus insertion." *Id.* Petitioner had her third PT evaluation on August 10, 2017. *Id.* at 89. Petitioner attended five PT sessions in the six weeks that followed. *Id.* at 57-60, 82. By September 28, 2017, Petitioner indicated to Dr. Hashemi that the surgery had helped a lot. *Id.* at 6, 184.

On April 5, 2018, Ms. Lawson returned to Dr. Hashemi with increased strain in her left shoulder and an aching pain. Ex. 1 at 446. Petitioner had her third cortisone injection at this visit. *Id.* On August 31, 2018, Petitioner returned to Dr. Hashemi, stating that she was doing well, but started having pain. Ex. 9 at 1. Petitioner received her fourth cortisone injection at this visit. *Id.* A month later, on September 29, 2018, Petitioner returned to Dr. Hashemi again noting dull pain in the front of her shoulder. *Id.* at 2. Ms. Lawson received her fifth cortisone injection at that time. *Id.* Petitioner had her second MRI on October 12, 2018. Ex. 10 at 1. The MRI revealed, "1. Mild supraspinatus and impression tendinopathy. No focal rotator cuff tear. 2. Small tear of the posterior glenoid labrum. 3. Mild bone marrow edema in the distal clavicle and acromion." *Id.*

Ms. Lawson had her second shoulder surgery, including left shoulder diagnostic arthroscopy, subacromial decompression, extensive debridement of bursa and subacromial space, and arthroscopic distal clavicle excision, on November 18, 2018.

Ex. 12 at 3. The findings of the surgery were "extensive bursitis around the subacromial space, extensive adhesions around the subacromial space, which were resected with cautery and a shaver, and thickened remnant of the CA ligament and also distal clavicle osteoarthritis." *Id.*

To rule out Petitioner's neck as the origin of her pain, Petitioner had another neck MRI on February 1, 2019, that proved unremarkable. Ex. 12 at 10. By February 8, 2019, Dr. Hashemi was "not sure what else we could do for Mindy," and referred Petitioner to the University of Virginia (UVA) Health System. *Id.* at 13.

Petitioner had a fourth MRI on April 30, 2019, and a fifth MRI on July 17, 2019, which revealed a posterior labral tear. Ex. 13 at 5, 10. On July 26, 2019, Petitioner was diagnosed with a SLAP tear. Ex. 14 at 44. On July 29, 2019, Dr. Brian Werner at UVA administered Petitioner's sixth steroid injection. *Id.* at 39.

Ms. Lawson had her third shoulder surgery on November 11, 2019, which included left shoulder open subpectoral biceps tenodesis and diagnostic arthroscopy of the left shoulder with extensive debridement. Ex. 14 at 20. Petitioner had her fourth PT evaluation on November 22, 2019. Ex. 16 at 1. Petitioner attended eleven PT sessions in the six weeks that followed. *Id.* at 1-32.

In June 2020, Petitioner began seeing a pain management specialist, Dr. Devashish Sen, for shoulder pain. Ex. 17 at 1, Ex. 18 at 8. Petitioner had her sixth MRI on October 5, 2020. Ex. 17 at 1-2. This MRI revealed "1. Postsurgical changes from interval biceps tenodesis. 2. Mild rotator cuff tendinosis without significant cuff tear. 3. Similar appearance of the labrum from prior exams." *Id.* On October 9, 2020, Petitioner received her seventh steroid injection related to her shoulder pain. Ex. 18 at 10. Dr. Sen recommended, and Petitioner began receiving, platelet rich plasma (PRP) injections on October 22, 2020. *Id.* at 11-13.

### III. Relevant Legal Standards

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health &*

4

*Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). AndI  may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579, 489-90 (2013). In *Graves*, Judge Merrow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### IV.     Appropriate Compensation for Petitioner's Pain and Suffering

In this case, Ms. Lawson's awareness of her injury is not disputed, leaving only its severity and duration to be considered. In determining appropriate compensation for Petitioner's pain and suffering, I have carefully reviewed and considered the complete record in this case, and relied upon the aforementioned legal standards as well as other relevant Program decisions.[5] However, my determination is ultimately based upon the specific circumstances of this case.

Citing *Hooper*,[6] Ms. Lawson requests an award of $225,000.00 in past, plus and $1,000.00 per year for future pain and suffering, asserting that "the physical and mental anguish she has been through, and the long duration of her injury" justify an award of this magnitude. Br. at 11-13. She avers that "four years after her injury, [she] continues to experience pain when using her arm, and is unable to use her arm as fully as she did before her vaccination injury." *Id.* at 13. Petitioner also argues that the medical records "show a severe and continuous injury for the past four years . . . ." and "[a]ll conservative treatment aimed at controlling and eradicating [P]etitioner's vaccine-induced pain failed, leaving [P]etitioner no choice but to undergo three painful surgeries." *Id.* She therefore asserts entitlement to "the largest [pain and suffering sum] ever awarded in the Special Processing Unit based on her awareness of injury, the severity of her injury, and how long Petitioner is expected to suffer from her injury." *Id.* at 14.

Respondent unhelpfully elected not to propose a counter-sum, and instead has deferred resolution of a reasonable amount for this element of damages to my discretion. Opp. at 1. Thus, Respondent concedes *some* pain and suffering amount is warranted.[7] Respondent contends that he could not identify any cases with reasoned damages decisions comparable to the case at hand. *Id.* at 4. Respondent does argue, however,

---

[5] Statistical data for all SIRVA cases resolved in SPU from inception through January 2020 as well as a brief description of any substantive decisions can be found in the following decisions: *Vinocur v. Sec'y of Health & Hum. Servs.,* No. 17-0598V, 2020 WL 1161173 (Fed. Cl. Spec. Mstr. Jan. 31, 2020); *Wilt v. Sec'y of Health & Hum. Servs.,* No. 18-0446V, 2020 WL 1490757 (Fed. Cl. Spec. Mstr. Feb. 24, 2020); *Smallwood v. Sec'y of Health & Hum. Servs.,* No. 18-0291V, 2020 WL 2954958 (Fed. Cl. Spec. Mstr. Apr. 29, 2020).

[6] *Hooper v. Sec'y of Health & Hum. Servs.*, No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for pain and suffering).

[7] Respondent is admonished in the future to be forthcoming in proposing a damages position, in cases like this one where the dispute centers not on entitlement to pain and suffering *per se* but to the amount. I will interpret future such postures to reflect the view that Respondent cannot articulate preponderant arguments for why Petitioner's position is wrong, and will determine a reasonable award based on that fair supposition.

that Petitioner's SLAP tear was not related to her SIRVA. *Id.* Respondent also notes that *Hooper* is not binding on my decision in this case, and further notes that *Hooper* "did not involve additional, non-SIRVA-related injuries such as a SLAP tear confounding the assessment of past damages." *Id.* at 5. Respondent further argues that Petitioner's pain was not continuous, as she experienced complete resolution of her symptoms following her first surgery in July 2017, and there is no evidence that Petitioner suffered a permanent loss of use of her shoulder. *Id.*

Pursuant to my oral ruling on December 11, 2020 (which is fully adopted herein), **I find that $205,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.** My calculation arises from the following reasons.

First, I find that other precedent better supports a lower figure than what Petitioner demands.[8] While Petitioner cites to *Hooper*, the case most analogous to the case at hand is *Schoonover*.[9] There, the claimant reported constant pain, had pain at rest, and often described pain with activity as severe, with a rating of eight out of ten. Furthermore, the pain did not improve following multiple steroid injections or two surgeries. *Schoonover, 2020 WL* 535134 at *4. The petitioner also underwent lengthy and significant medical and surgical care and treatment and suffered episodes of severe pain and limited mobility. *Id.* at *5. In deciding *Schoonover,* former Chief Special Master Dorsey observed that it was (at the time) the only SIRVA case in the Program where a petitioner underwent two shoulder surgeries on top of multiple steroid injections and numerous physical therapy sessions. *Id.* As a result, the *Schoonover* petitioner was awarded $200,000 in past pain and suffering, plus $1,200 per year for her life expectancy, reduced to net present value. *Id.* at *6.

As was the case in *Schoonover*, the severity of the injury at issue in this case, along with the overall course of injury including the number of interventions, support a higher than normal award for pain and suffering in this case. Based on the current records, over the course of just four years, Ms. Lawson underwent an unprecedented three surgeries, seven steroid injections, four rounds of PT, six MRIs, and most recently started PRP injections. Additionally, she explained that she was fired from her job following her SIRVA, after her first surgery she was unable to lift her arm above her head without crying, she lives with a constant ache of about 2/10, and her pain increases depending on her

---

[8] I acknowledge that prior pain and suffering determinations are not binding on this decision. *See Nance v. Sec'y of of Health & Human Servs.*, No. 06–730V, 2010 WL 3291896 at *8 (Fed.Cl.Spec.Mstr. July 30, 2010); *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand."). These cases, however, provide persuasive guidance herein.

[9] *Schoonover v. Sec'y of Health & Hum. Servs*., No. 13-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) (awarding $200,000.00 for past pain and suffering)

activity. Ex. 7 at 4; Ex. 20 at 2. Petitioner further explained that she is still unable to go running, do certain exercise routines, or lay on her stomach with her arms outstretched. Ex. 20 at 2. Petitioner also used her vacation time treating her SIRVA, and she had lost wages which were partial covered by short-term disability. *Id.* at 3. All of the above factors favor a larger than usual past pain and suffering sum.

At the same time, however, it appears that Petitioner's pain had an intermittent character. As Respondent noted, there are instances documented in the record where Petitioner did experience some relief from her pain. *See e.g.,* Ex. 1 at 6, 184; Ex. 14 at 42. Moreover, it is ambiguous whether, and to what extent, Petitioner's most recent surgical intervention was related to her SIRVA or something else. I cannot conclude with certainty that Petitioner's SLAP tear was completely attributable to the SIRVA injury. While the SLAP tear may have some relationship to the SIRVA, that is difficult to determine from the record before me. This raises the question, as we get further from the vaccine administration, whether *all* of Petitioner's sequelae are related to the SIRVA, even if Petitioner continues to live in some amount of pain. I therefore find a total past sum lower than *Hooper*, although in that general range, is warranted.

I also conclude that an award of future pain and suffering is not appropriate in this case. It does not appear that Petitioner has the level of disability that some petitioners face after a SIRVA injury. Additionally, while Petitioner did face unfair actions by her employer in seeking treatment for her SIRVA, ultimately, her ability to work and earn income has been unaffected (as reflected in part by the fact that her damages do not include lost wages, past or future).

Overall, I conclude that an award, consistent with *Schoonover*, of $205,000, is an appropriate award for Petitioner's actual pain and suffering.

## V. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $205,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[10] I also find that Petitioner is entitled to $10,688.69 in actual unreimbursable expenses (a sum the parties did not dispute).**

---

[10] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

8

---

Accordingly, **I award Petitioner a lump sum payment of $215,688.69 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[11]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.